UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-20771-CIV-HUCK/O'SULLIVAN

AMERICAN GUARANTEE & LIABILITY
INSURANCE COMPANY,

    Plaintiff,
vs.

SIMON ROOFING & SHEET METAL
CORP.; LIBERTY MUTUAL FIRE INSURANCE
COMPANY; and FLORIDA DIVERSIFIED
FILMS, INC.,

    Defendants.
_____/

## ORDER

  This declaratory judgment action involves a dispute between an insured, Defendant Simon Roofing & Sheet Metal Company ("Simon") and its excess insurer, Plaintiff American Guarantee & Liability Insurance Company ("American Guarantee").  Simon, a roofing company, was sued by one of its customers after allegedly causing considerable damage to the customer and its place of business.  Simon informed its primary insurer, Liberty Mutual Fire Insurance Company ("Liberty Mutual") about the occurrence (and the lawsuit that followed shortly on its heels), but failed to notify American Guarantee until after a final judgment was entered against Simon.  That judgment exceeded the primary insurance coverage.  American Guarantee contends that Simon breached the excess insurance policy by failing to comply with its notice-to-insurer requirements.

  The excess policy contained two notice provisions.  The first notice provision (the "occurrence notice provision"), Section 6(A)(10)(a), required the insured to notify the excess insurer of "an occurrence which may result in damages covered by th[e] [excess] policy . . . ."  The second notice provision (the "claim/suit notice provision"), Section 6(A)(10)(b), required

1

the insured to notify the excess insurer of any "claim or suit" that was "reasonably likely to involve th[e] [excess] policy . . . ." American Guarantee also contends that it was prejudiced by the insured's breach, and thus should be relieved of its obligations under the excess policy.

Both parties filed motions for summary judgment. American Guarantee contends in its Motion for Final Summary Judgment ("Mot.") (D.E. No. 86), filed Nov. 7, 2012, that it's entitled to judgment as a matter of law on the issue of whether Simon complied with the excess policy's notice provisions, and the related issue of whether American Guarantee was prejudiced by Simon's failure to comply. Simon's Motion for Partial Summary Judgment (D.E. No. 88), filed Nov. 7, 2012, directs the Court to a different legal question: whether the claim brought against Simon in the underlying lawsuit is the sort of claim covered by American Guarantee's excess policy.

The Court has carefully considered the parties' written submissions, the record, the applicable law, and heard oral argument on March 7, 2013. For the reasons stated below, because the Court agrees with American Guarantee's position that Simon's late notice relieves American Guarantee of its obligations under the excess policy, the Court need not reach the merits of Simon's Motion.

## I.     BACKGROUND

In July 2006, Simon received a request to restore the roof of a warehouse located at 1175 Northwest 159th Street in Miami Gardens, Florida (the "Miami Gardens warehouse"). For Simon, a 100-year-old national roofing business, a roof restoration was a routine task. Simon's roofing crew began performing the roof restoration on October 16, 2006, and everything seemed to be business as usual. But that was true only until October 19, 2006. On that date, Simon received word from Florida Diversified Films, a tenant in the Miami Gardens warehouse, that

debris was falling from the roof and contaminating its machines. Simon immediately notified its primary insurer, Liberty Mutual of the occurrence, prompting Liberty Mutual to send an investigator to assess the damage. Simon, however, failed to notify its excess insurer, American Guarantee, of the occurrence, notwithstanding Liberty Mutual's directive to Simon to notify its other insurers of the occurrence.[1] On October 30, 2006, only two weeks after Simon began the roof restoration, Florida Diversified Films filed suit against Simon, seeking to hold it responsible for the damages Florida Diversified Films sustained as a result of the allegedly faulty roof restoration. Simon did not give notice to American Guarantee of the occurrence or suit.

Initially, Florida Diversified Films sought to hold Simon liable only for the damages to its machines, which were contaminated by the fallen debris, and associated clean-up costs. The scope of Florida Diversified Films's lawsuit changed dramatically, however, on July 1, 2007. On that date, Florida Diversified Films shut down its business, allegedly because many of its customers didn't return once Florida Diversified Films's damaged machines were back in service. The change was reflected in Florida Diversified Films's September 29, 2007 answers to interrogatories: Florida Diversified Films claimed $3.572 million in damages. This amount reflected not only the repair cost of Florida Diversified Films's damaged machines and associated clean-up costs, but also Florida Diversified Films's lost business earnings for a ten-year period. Simon was well aware of this new development, and even though Liberty Mutual's policy covered Simon for only the first $1 million of damages, Simon again failed to provide notice of the occurrence or lawsuit to American Guarantee.

After litigating Florida Diversified Films's claim for over a year, on October 22, 2008, Simon and Florida Diversified Films tried mediation. At mediation, Florida Diversified Films

---

[1] Liberty Mutual's policy provided coverage for losses totaling $1 million and less. Above that amount, American Guarantee provided coverage to Simon Roofing, with a cap of $25,000,000.

continued to assert that it sustained damages in the millions of dollars.  While Florida Diversified Films retreated somwhat from its initial damages claim of $3.572 million, both Florida Diversified Films's estimate of damages (approximately $2 million) and initial demand (approximately $1.5 million) exceeded the limits of Liberty Mutual's policy.  Simon, its attorney, and Liberty Mutual, evaluated Florida Diversified Films's claim at an amount far below the demand and well within the limits of Liberty Mutual's policy.  Unable to agree on a settlement amount, the mediation was unsuccessful.[2]  Simon still did not give notice of the occurrence or suit, even though Liberty Mutual had previously urged Simon to do so.

On May 10, 2010 — over one and one-half years after the parties' failed mediation and almost four years after suit was filed — the case went to trial in the Eleventh Judicial Circuit of Florida.  At trial, one of Florida Diversified Films's expert witnesses testified that Florida Diversified Films' loss of business value alone was $1,492,000.[3]  Simon was well aware of the progress of the trial, as it received daily trial updates.  *See* Dep. of Steve Duke 130:4-6 (D.E. No. 86-1).  One update in particular, which came on the last day of trial, reaffirmed that closing arguments yielded "no surprises from [Florida Diversified Films]," which continued to claim $1.49 million for loss of business value and $775,000 for its destroyed machines.  Notwithstanding this, Simon did not notify American Guarantee of the claim or that the claim was being tried.[4]

---

[2]  The only parties that attended the mediation were: Simon's attorneys (provided, of course, by Liberty Mutual); a representative from Liberty Mutual; and Florida Diversified Films's counsel.  American Guarantee was not notified of the mediation or its unsuccessful result.

[3]  Including Florida Diversified Films's claim for damages to its machines, Florida Diversified Films claimed damages upwards of $2 million.

[4]  The twelve-day trial spanned one month and 10 days; it began on May 10, 2010 and ended on June 20, 2010.

On August 6, 2010, the state trial judge presiding over the underlying suit entered a final judgment in favor of Florida Diversified Films, awarding it $1,492,000 — precisely the amount Florida Diversified Films sought for its loss of business value.[5] Notably, even though the judgment entered against Simon directly implicated its excess insurer, American Guarantee, it wasn't until about two months later (on October 14, 2010), *see* Resp. Ex. 97, that Simon finally notified American Guarantee of Florida Diversified Films's claim (now a final judgment).[6] By then, four years had elapsed since the occurrence and filing of the suit, and almost three years since Florida Diversified Films's $3.572 million demand. American Guarantee denied coverage, claiming that it was released from its obligations under the policy because of Simon's failure to comply with the excess policy's notice provision.

After reserving its rights and remedies under the excess policy, American Guarantee filed this action for declaratory relief. *See* Pl.'s Am. Compl. for Decl. J. and Other Relief (D.E. No. 32), filed May 10, 2012. Specifically, American Guarantee seeks two declarations: first, because Simon failed to notify American Guarantee of the October 19, 2006 occurrence until well after Simon was found liable for $1,492,000 at trial, Simon breached both of its notice obligations under the excess policy, and American Guarantee was prejudiced by the breach; second, in the alternative, because the excess policy does not cover economic damages, even if Simon didn't breach the notice provision, American Guarantee need not indemnify Simon for its loss at trial.

---

[5] The state court's judgment was affirmed by Florida's Third District Court of Appeal, which also awarded Florida Diversified Films $530,646 in prejudgment interest.

[6] The parties dispute when American Guarantee received notice of the final judgment entered against Simon. Simon contends that American Guarantee received notice on October 14, 2010; American Guarantee contends it didn't receive notice until November 2, 2010. This dispute of fact is immaterial to the Court's analysis. But for purposes of argument, the Court credits Simon's version of the facts.

As indicated above, American Guarantee and Simon have filed motions for summary judgment. American Guarantee contends that because Simon didn't notify American Guarantee of Florida Diversified Films's lawsuit until after the state trial court entered final judgment for Florida Diversified Films, Simon breached the excess policy's notice provisions, as a matter of law, thereby releasing American Guarantee from its obligations under the policy. Simon's Motion directs the Court's attention to a different legal question — whether Florida Diversified Films's claim for loss business value is the sort of claim covered by American Guarantee's policy. Because the Court agrees with American Guarantee's contention that Simon's late notice relieves Florida Diversified Films of its obligations under the excess policy, the Court need not reach the merits of Simon's Motion.

## II.   LEGAL STANDARD

District courts are directed to grant summary judgment only when the evidence shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a), (c). "[T]he court must view all the evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (per curiam) (quoting *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks omitted)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Channa Imports, Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. Jul. 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

6

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks and alterations in original omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "[T]he plain language of Rule 56 [] mandates the entry of summary judgment [] . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting *Celotex*, 477 U.S. at 322).

### III. ANALYSIS

Compliance with the notice requirements of American Guarantee's excess policy is a condition precedent to American Guarantee's duty to provide coverage under the policy. Under Pennsylvania law, however, breach of the policy's notice provision is not enough to relieve the insurer of its obligations under the insurance policy; the insurer must also have been prejudiced by the breach.[7] *See, e.g.*, *Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America*, 693 F.3d 417, 434 (3d Cir. 2012) (The Supreme Court of Pennsylvania held in *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66 (1977), that "under a liability insurance policy, late notice will not relieve an insurer of its coverage obligations unless *it proves* that breach of the notice provision caused it prejudice") (emphasis added; citation omitted). Thus, the Court's analysis is two-fold: first, did Simon breach the excess policy's notice provision? If it did, was American Guarantee prejudiced by the late notice? The Court answers yes to both questions.

---

[7] The parties initially disputed whether Ohio or Pennsylvania law applied to this case. The parties now agree that Pennsylvania law applies.

### A. Breach Analysis

The notice provisions found in primary and excess insurance policies are often not the same. Because excess coverage is contingent on exhaustion of the primary insurance policy, "excess insurers generally do not require notification of occurrences until the excess policy is r*easonably likely* to be implicated." *Lumbermens Mutual Casualty Co. v. RGIS Inventory Specialists, LLC*, 682 F.3d 46, 52 n.4 (2d Cir. 2010) (per curiam) (emphasis added) (citation omitted); *see also Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.*, 111 F.3d 852, 861 (11th Cir. 1997) ("Excess policies [] usually require an assured to give notice of claims that appear 'likely to involve' the excess."). Not so for primary insurance policies. Primary insurers generally only require notification of any occurrence or law suit that *may* (as opposed to one that is *reasonably likely* to) give rise to a claim covered under the policy.

This makes the excess policy American Guarantee issued to Simon different from the norm. It contained not one, but two notice provisions, and the "occurrence notice" provision, Section 6(A)(10)(a), included a notice obligation commonly found in primary insurance policies: Simon was required to notify American Guarantee "as soon as practicable of an occurrence which *may* result in damages covered by [the excess] policy." (emphasis added). The "claim/suit notice provision," Section 6(A)(10)(b), on the other hand, required Simon to provide notice as soon as practicable "[i]f a claim or suit against [Simon] is *reasonably likely* to involve [the excess] policy . . . ." (emphasis added). American Guarantee contends that Simon breached both the occurrence notice provision and the claim/suit notice provision because "[f]or over three years, Simon knew that Florida Diversified Films's claim against Simon sought damages over $1 million, yet it never notified American Guarantee of the claim." Mot. 17. Simon takes a different view. Simon invokes the familiar canon of statutory interpretation that where two provisions seemingly

8

apply, the more specific of the two governs. *See* Resp. 17-18. And thus, argues Simon, because the claim/suit notice provision applies in the specific instance when a "claim or suit" is filed, rather than (as in the occurrence notice provision) of "an occurrence," the claim/suit notice provision supersedes the occurrence notice provision and governs.

The problem with Simon's argument is it treats the two notice provisions as mutually exclusive — if one applies, the other doesn't. The Court disagrees. A "contract should be construed so as to give full meaning and effect to all of its provisions," *Olin Corp. v. American Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012) (citation omitted). This well-established principle is applicable here: Simon was obligated to comply with both because the plain language of the policy clearly contemplates that the two provisions are separate, distinct requirements that trigger upon the occurrence of distinct events and serve different functions.[8] The occurrence notice provision triggers when the insured is involved in some *occurrence* that "may result in damages covered by" the excess policy; the claim/suit notice provision triggers when a "*claim or suit* is filed that is reasonable likely to involve" the excess policy. The two provisions also require entirely different forms of notice and information.[9] Thus, Simon had to provide notice to American Guarantee of (1) any *occurrence* that may involve the excess policy (regardless of whether a lawsuit is ever filed) and (2) any *lawsuit* that was reasonably likely to involve the excess policy. In light of the material differences between the occurrence and

---

[8] Contrary to Simon's contention, the excess policy does not contain any language indicating that the occurrence notice provision is superseded, and thereby negated, when the claim/suit notice provision comes into play.

[9] The occurrence notice provision requires the insured to provide the following limited information: "(1) How, when and where the occurrence took place; (2) The names and addresses of any injured persons and witnesses; and (3) The name and location of any injury or damage arising out of the occurrence." *See* Pl.'s Am. Compl. Ex. 2 (American Guarantee-issued insurance policy). The claim/suit notice provision, by contrast, required more detailed documentation and information, and, of course, the insured's cooperation.

claim/suit notice provisions, it was entirely possible for Simon to have breached one or both notice provisions.

Whether Simon breached the occurrence notice provision depends upon whether the damages allegedly caused by Simon's roof restoration qualified as "an occurrence which *may* result in damages covered by" the excess policy. Or, put differently, whether the occurrence was of such a character that it "would have suggested a *reasonable possibility* of a claim that would trigger [American Guarantee's] coverage." *Olin Corp. v. Ins. Co. of North America*, 743 F. Supp. 1044, 1054 (S.D.N.Y. 1990) (emphasis added) (citing *Harbor Ins. Co. v. Trammell Crow Co., Inc.*, 854 F.2d 94, 98-99 (5th Cir. 1988)). Making all reasonable inferences in Simon's favor the Court concludes as a matter of law that it was *entirely* — not just *reasonably* — possible that the alleged damages from the roof restoration would implicate American Guarantee's excess policy.

Like many occurrences, it's not always immediately clear the extent to which someone or something is damaged. That was certainly true in this case. When Simon was first notified that the roof restoration of the Miami Gardens warehouse went awry it appeared only "that dust and dirt from the roof was traveling through the ceiling and damaging machines and inventory." Mot. Ex. 1 (emphasis omitted). Florida Diversified Films's alleged damages thus seemed to be limited to the repair costs or replacement value of Florida Diversified Films's machines — damages well within the primary insurance coverage. On July 1, 2007, however, Florida Diversified Films's alleged damages changed dramatically. On that date Florida Diversified Films shut down its business, contending this was the result of Simon's defective roof restoration. Florida Diversified Films's claim went from "one of clean-up to one of damages associated with the closing of the business." Mot. Ex. 1. And as early as September 29, 2007, and in its answers to interrogatories, Florida Diversified Films claimed damages of $3.572

10

million. *Id.* The $3.572 million figure reflected Florida Diversified Films's claim that Simon was responsible not only for damages to Florida Diversified Films's machines, but also for Florida Diversified Films's lost earnings for a *ten-year period*. *Id.* In light of the developing nature and extent of the damages allegedly caused by Simon's roof restoration, the Court concludes as a matter of law that no later than September 29, 2007, Simon was obligated to notify American Guarantee of the October 19, 2006 occurrence.

This is because American Guarantee's excess policy required Simon to provide American Guarantee with notice of any occurrence "which *may* result in damages covered by th[e] [excess] policy." (emphasis added). And the term "may" is broadly defined as — and generally understood to mean — something that is merely a possibility. *See* BLACK'S LAW DICTIONARY (8th ed. 2004) (defining "may" as "[t]o be a possibility"); *see also Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.*, 111 F.3d 852, 860 (11th Cir. 1997) (in distinguishing from a notice provision that required the insured to provide notice of any suit that was "reasonably likely" to involve the insurance policy, the Court stressed that had the insurance policy "require[d] notice upon the *mere possibility* that the excess will be involved . . . the policy would [] require notice of *all* claims against the insured") (emphases added).[10]

To avoid the force of the application of the occurrence notice provision, Simon contends that it was relieved of its obligations under the occurrence notice provision at the instant Florida Diversified Films filed a lawsuit against Simon because at that point the claim/suit notice

---

[10] At the March 7, 2013 oral argument, Simon contended that the Third Circuit in *Trustees of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890 (3d Cir. 1987), posited that the term "may" in an excess insurance contract refers to something that is closer to "probable" than "possible." Nothing in the Third Circuit panel's opinion supports such a cramped interpretation of the term "may." Rather, *Trustees of Univ. of Pa.* dealt with an entirely different notice provision — one more akin to the claim/suit notice provision found in American Guarantee's excess policy. It required notice "whenever the Insured had information from which it might 'reasonably conclude' that an occurrence was '*likely to involve*' the policy." *Id.* at 896 (emphasis added).

provision took over. The Court disagrees. The plain terms of the occurrence notice provision makes unmistakably clear that Simon's obligation under the provision is a continuing one, which, because of the developing nature of the occurrence, triggered no later than one year after the negligent roof restoration — when Simon was first definitively advised, by Florida Diversified Films's answers to interrogatories, that Florida Diversified Films claimed damages far in excess of $1 million. At the very least, at that point, an unfavorable, multi-million-dollar judgment against Simon *may* have resulted, thus triggering Simon's contractual obligation to provide American Guarantee with notice of the occurrence.[11] But because Simon didn't provide notice until three years later — a delay that indisputably was not "as soon as practicable" — Simon breached the excess policy. The Court thus finds that Simon breached the occurrence notice requirement set forth in Section 6(A)(10)(a).

### B. Prejudice Analysis

For American Guarantee to be relieved of its obligations under the excess policy it isn't enough that Simon breached a notice provision under the policy. Under Pennsylvania law, American Guarantee must also show that it was prejudiced by the breach. The contours of what qualifies as prejudice as a matter of law under Pennsylvania law are, however, somewhat elusive. But "[t]here appears to be no dispute [] that a court may find prejudice to an insurer as a matter of law." *See Granary Assocs., Inc. v. Evanston Ins. Co.*, No. 99-5154, 2000 WL 1782544, at *6 (E.D. Pa. Dec. 5, 2000). One factual context where courts readily find prejudice as a matter of law is where "notice is first supplied when the insured's liability is a *fait accompli*." *Nationwide*

---

[11] The Court need not determine whether notice was required earlier than the date of the $3.572 million claim of damages, as American Guarantee contends that this was the triggering event that obligated Simon to provide notice under the excess policy's notice provisions. The Court also need not determine whether Simon breached the claim/suit notice provision in light of the Court's holding that Simon violated the occurrence notice provision as a matter of law.

12

*Mutual Fire Ins. Co. v. Nova Real Estate LLC*, Civil Action No. 09-0303, 2011 WL 721905, at *6 (E.D. Pa. Mar. 1, 2011) (citing *United Nat'l Ins. Co. v. Admiral Ins. Co.*, No. 90-7625, 1992 WL 210000, at *6 (E.D. Pa. Aug. 19, 1992)) (internal quotation marks omitted). That is, "Pennsylvania [law] forgives untimely notice *only where* the insurer is 'afforded the opportunity to participate in the proceedings arising from a claim before the liability of its insurers becomes fixed.'" *Id.* (citation omitted). *Nationwide Mutual Fire Ins. Co. v. Nova Real Estate LLC* and *United Nat'l Ins Co. v. Admiral Ins. Co.*, Civ. A. No. 90-7625, 1992 WL 210000 (E.D. Pa. Aug. 19, 1992), are illustrative.

In *Nova Real Estate*, the insured (a real estate company) was sued for damages caused by a fire in one of its buildings. As here, the insured was required to provide notice to its insurer of "an occurrence which may result in a claim" covered by the policy, but waited until more than three and one-half years after the fire and nearly a month and a half after it settled the lawsuit to notify its insurer. *See Nova Real Estate*, 2011 WL 721905, at *6. Because the insurer's receipt of post-settlement notice denied the insurer the ability to, among other things, "evaluate the verdict risk and settlement value of the case," the court found that the insurer had "suffered 'a loss of substantial defense opportunities,'" and was thus prejudiced as a matter of law. *See id.* The same was true in *United Nat'l Ins. v. Admiral Ins. Co.* In that case, one of the insurance companies called upon to indemnify the insured in a products liability lawsuit was given notice only after one of the insured's other insurers had settled the lawsuit. *See United Nat'l Ins.*, 1992 WL 210000, at *2. As in *Nova Real Estate*, the court held that "where notice is first supplied when the insured's liability is a *fait accompli*," then prejudice will be found as a matter of law. *Id.* at *6.

13

So too here. Only after an unfavorable verdict was entered against Simon at trial did Simon notify American Guarantee of the occurrence underlying Florida Diversified Films's lawsuit. This was four years after the roof restoration and suit was filed; three years after Florida Diversified Films claimed, under oath, damages of $3.572 million; two years after the parties attempted mediation (at which Florida Diversified Films claimed $2 million in damages and the mediator indicated that the case could settle for $500,000); and three months after the court found Florida Diversified Films's damages to be $1.49 million. At that point, American was denied its contractual right to "participate in the investigation and settlement of any claim, or defense of any suit that [American Guarantee] feel[s] may create liability on [American Guarantee's] part under the terms of [the excess] policy." *See* Pl.'s Am. Compl. Ex. 2 (American Guarantee-issued insurance policy).[12] And, as a result, was "prevented . . . from participating in, and perhaps effecting, a better outcome." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. General Star Indemnity Co.*, 216 Fed. App'x 273, 281 (3d Cir. 2007) (applying California law) (holding that excess insurer was, as a matter of law, "*substantially* prejudiced" by insured's failure to notify the excess insurer of a lawsuit implicating the excess policy until "a scant four weeks before the Pennsylvania Supreme Court denied the final appeal") (emphasis added). "This is precisely the type of harm reasonable notice clauses are designed to prevent." *Nova Real Estate LLC*, 2011 WL 721905, at *6 (citation omitted).

Simon's counter to all this is that American Guarantee cannot establish as a matter of law that "it would have probably obtained a better result," because all American Guarantee would have done is "investigate via the Internet the attorneys in the case and possible media coverage

---

[12] *Cf. Trustees of Univ. of Pa.*, 815 F.2d at 893 (noting that excess insurer did not have a contractual right "to assume the defense of suits against [the insured]," but only the right "to associate with the Insured or Insured's underlying insurer . . . in the defense and control of any claim where the claim involves or appears reasonably likely to involve [the excess insurer]").

14

of the occurrence." Resp. 26. The problem with this argument is twofold. First, it misconstrues Pennsylvania law. Notice clauses are "designed to protect the insurance company from being placed in a substantially less favorable position than it would have been had timely notice been provided . . . ." *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 75 (1977). One way the insurer can show it's been placed in a substantially less favorable position is to show that had notice been provided the result at trial probably would have been different. But, contrary to Simon's contention, this is certainly not the only way the insurer can show prejudice. The insurer can also show more generally that the lack of notice "has led to disadvantageous, substantive results — in other words, [] the insured's violation of its contract has proximately caused its insurer damages." *Trustees of the Univ. of Pa.*, 815 F.2d at 898. American Guarantee has made that showing here, as a matter of law. Because Simon neglected to provide American Guarantee with notice of the occurrence at least as early as when Florida Diversified Films claimed, in its interrogatory answers, $3.572 million in damages, but instead waited until after liability was a *fait accompli*, American Guarantee was denied wholesale the opportunity to do anything — much less have counsel of its choosing oversee the litigation and "reasonably evaluate the verdict risk and [] settlement value of the case," *National Union Fire Ins. Co of Pittsburgh, Pa.*, 216 Fed. App'x at 281. The upshot of this is American Guarantee was deprived of the opportunity to negotiate a resolution and "perhaps effect[] [] a better outcome." *Id.*

 The second problem with Simon's argument is it imputes to American Guarantee the position that even if it had received notice of the occurrence or lawsuit, American Guarantee "would not have conducted its own investigation of the facts relating to [Florida Diversified Films's] claim . . . ." Resp. 26. Rather, Simon contends, that American Guarantee would have, at most, conducted Internet research of the attorneys litigating the case and whether the occurrence was

15

the subject of media exposure. *Id.* This is a wholly inaccurate account of the deposition testimony of Julie Frietag — the excess claim specialist whom American Guarantee assigned to this claim.[13]

Ms. Freitag repeatedly made clear that the extent of the resources American Guarantee expends regarding a submitted claim is evaluated on a "case-by-case basis," Dep. of Julie Freitag 25:12 (D.E. No. 111-4), and that if the occurrence materialized into a lawsuit she would typically contact defense counsel to "find out about . . . the claim to evaluate exposure to [American Guarantee's] layer of coverage," *id.* at 24:11-12. And had Ms. Freitag known that the Florida Diversified Films litigation was going to trial she "would have retained counsel to monitor [the] trial at the very minimum," *id.* at 161:17-18, "especially [because it was] a bench trial," *id.* at 162:6-9. She also testified that "when there is a demand within [American Guarantee's] layer of coverage or slightly below and the case is not resolving, [American Guarantee] would [] retain counsel," *id.* at 36:6-9, to "[e]valuate the exposure of the case" and provide "their independent evaluation based on the venue and their experience in similar cases," *id.* at 27:22-24. This may have been especially true in this case because, as Ms. Freitag testified, American Guarantee's claims department had been having issues with (the primary insurer) Liberty Mutual's claims department, which "over the course of the past few years ha[d] been making some goofy decisions in [American Guarantee's] opinion and taking risks where they shouldn't and creating excess exposures," *id.* at 31:24-25-32:1-2.

Ms. Freitag's testimony stands unrefuted. In light of Simon's failure to provide American Guarantee with notice of Simon's allegedly damaging roof restoration resulting in a $3.572 million claim and the lawsuit that followed until well after American Guarantee's liability was a

---

[13] At the time of her deposition, Ms. Freitag was no longer an excess claim specialist for American Guarantee, having taken a similar position at another insurance company.

*fait accompli*, the Court concludes that American Guarantee was prejudiced as a matter of law, and thus relieved of its obligations under the excess policy.

### C. CONCLUSION

American Guarantee's excess policy provided in unmistakable terms that Simon must give notice of any occurrence that may involve the excess policy. One year after Simon's negligent roof restoration, it came to light that Florida Diversified Films claimed $3.572 million in damages. At that point it was not only reasonably, but *entirely*, possible that the excess policy would be implicated. Yet Simon waited until three years had elapsed and a $1.49 million judgment entered against it to notify American Guarantee of the occurrence — *i.e.*, the negligent roof restoration and resulting damage. By waiting this long, Simon deprived American Guarantee of any opportunity to produce a more favorable outcome, much less protect itself from an unfavorable judgment.

Consistent with the foregoing analysis, it is hereby

**ORDERED** that Plaintiff's Motion is **GRANTED**. It is hereby further

**ORDERED** that Defendant's Motion for Partial Summary Judgment (D.E. No. 88) is **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, March 12, 2013.

_____
**PAUL C. HUCK**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record